UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
CHERYL SCHUSSHEIM,

                        Plaintiff,                            **MEMORANDUM & ORDER**
                                                          **09 CV 4858 (DRH)(GRB)**

          -against-

FIRST UNUM LIFE INSURANCE COMPANY,

                         Defendant.
-----------------------------------------------------------------X
**APPEARANCES:**

**WILKOFSKY, FRIEDMAN, KAREL & CUMMINS**
Attorneys for Plaintiff
299 Broadway, Suite 1700
New York, New York  10007
By:  Mark L. Friedman, Esq.

**BEGOS HORGAN & BROWN LLP**
Attorneys for Defendant
2425 Post Road
Southport, Connecticut  06890
By: Patrick W. Begos, Esq.

**HURLEY, Senior District Judge:**

      Plaintiff Cheryl Schussheim ("plaintiff" or "Schussheim") commenced this action

pursuant to section 502 et al., of the Employee Retirement Income Security Act of 1974, as

amended, 29 U.S.C. § 1001 *et seq.* ("ERISA"), seeking to recover long term disability ("LTD")

benefits under an insurance policy issued by defendant First Unum Life Insurance Company

("First Unum" or "defendant").  Presently before the Court are the parties' cross-motions for

summary judgment pursuant to Federal Rule of Civil Procedure ("Rule") 56.  For the reasons set

forth below, defendant's motion is granted and Plaintiff's motion is denied.

## BACKGROUND

      The material facts are drawn from the parties' Local Civil Rule 56.1 Statements and the

administrative record  ("AR").

## I.    The Policy

First Unum issued a group disability insurance policy to Schussheim's employer, McAloon & Friedman, P.C. ("McAloon").  The policy gave First Unum "the discretionary authority to both determine your eligibility for benefits and to construe the terms of the policy." (AR 98.)   The policy defines "Disability," in relevant part, to "mean that because of injury or sickness . . . the insured cannot perform each of the material duties of his regular occupation" and "[f]or attorneys, 'regular occupation' means the speciality in the practice of law which the insured was practicing just prior to the date disability started."  (AR 102.)

Under the terms of the policy, a claimant is required to submit proof of claim and proof of continued disability and the proof must cover "1. The date disability started; 2. The cause of disability; and 3. how serious the disability is."  (AR 113.)  Proof of continued disability and regular attendance of a physician must be provided within 30 days of the date First Unum requests the proof.  Proof "must be given upon request and at the insured's expense."   (AR 113.) The policy excludes coverage for a disability that commences in the first twelve months after coverage begins that is "caused by, contributed to by, or resulting from a pre-existing condition," with preexisting condition defined as "a sickness or injury for which the insured received medical treatment, consultation, care or services including diagnostic measures, or had taken prescription drugs or medicines in the three months prior to the insured's effective date [of coverage]."  (AR 109.)  The policy gives the insurer, at its expense, "the right and opportunity to have an employee, whose injury or sickness is the basis of a claim: 1. examined by a physician, other health professional, or vocational expert of its choice; and /or 2.  interviewed by an

authorized Company representative. The right may be used as often as reasonably required."

## II. Plaintiff's Claim and Medical Information

Schussheim became employed as an attorney with McAloon on December 9, 2002 (AR 1723.) She timely filed a claim under the policy, claiming she became disabled from her occupation as a malpractice attorney with McAloon due to an October 28, 2003 operation to remove and replace a joint implant in her right foot.

Plaintiff's October 28, 2003 surgery was performed by Dr. Jonathan Haber, a podiatrist. By statement dated November 6, 2003, Dr. Haber informed defendant that he had removed a plastic joint, cleaned out the joint and inserted a new joint in plaintiff's right foot. According to the statement, plaintiff's restrictions, i.e., what she should not do, were "no excessive walking, bending, [and] no work" and her limitations, i.e., what she cannot do, were "no work, cannot wear shoes." (AR 50.)

In response to a request dated December 17, 2003 from defendant to Dr. Haber for all of plaintiff's medical records dated 9/01/2003 to present, defendant received the operation report, Dr. Haber's notes and a pathology report. Among other things, the operation report stated that plaintiff complaint was "of a first metatarsophalangeal joint to the right foot that has become progressively painful to her for many years. The patient has had multiple surgeries to this right foot. The patient reports that within the past year the right first metatarsophalangeal joint has become progressively painful and stiff. The patient has been seeing Dr. Haber as well as being seen in the New York College of Podiatric Medicine Clinic for conservative treatment for the painful deformity." (AR 75.)

In January 2004, defendant requested further information from Dr. Haber regarding

plaintiff's condition. Defendant also requested that plaintiff complete a supplemental questionnaire regarding any medical treatments between October 1, 2002 and December 31, 2002. Dr. Haber's response stated that in an eight hour work day plaintiff could engage in "1/4 hours sedentary activity" defined as "10 lbs. maximum lifting or carrying articles. Walking/standing on occasion. Sitting 6/8 hours." Dr. Haber opined that her recovery would take "at best 6 months." (AR 142-43.) Plaintiff's supplemental questionnaire stated she had not consulted a doctor, clinic or hospital and had not taken medication during the relevant period. (AR 135-139.)

By letter dated February 4, 2004, defendant requested that plaintiff sign a HIPAA authorization form for release of her medical records. According to the claim file, plaintiff called and informed defendant's representative that she was not comfortable signing the form and asked if she could cross out sections she did not like. She was advised that she could not alter the form. She was advised of two options available "she either needed to sign an unaltered form or send in that letter indicating no treatment at all." (AR 173.) Plaintiff returned a signed authorization dated February 11, 2004 on which she wrote "This authorization is valid for <u>pharmacy records between July 29, 2002 through January 29, 2003 only</u>." (AR 176 (emphasis in original).)

In or about February 2004, First Unum approved payment of benefits to plaintiff under a reservation of rights. (AR 165, 195.)

Thereafter, First Unum received additional information from Dr. Haber, dated March 15, 2004 which stated that plaintiff had "difficulty walking for long periods of time or standing;" "cannot work at this time; no bending/squatting." (AR 197) It also received a supplemental statement from plaintiff, dated March 22, 2004, stating that she "cannot walk or stand on my feet

for an extended period of time;" she is in "constant pain, with severe redness, swelling and burning"; and she is "severely limited in all physical activities and ambulation and cannot wear shoes." (AR 207.)

In a letter dated March 30, 2004, defendant wrote to plaintiff that it needed an updated certification but could not request the required information from her physician because she had not supplied a signed authorization to request medical records. The letter enclosed an authorization for records from January 1, 2004 to present and requested it be signed and returned and warned that if plaintiff "did not wish to sign the authorization than it was [her] responsibility to provide [First Unum] with all of the medical information needed to support [her] claim for ongoing benefits." (AR 222-223.) In response plaintiff advised she was going to ask the doctor's office to fax over all the current office visit notes. After receipt of treatment notes for February and March 2004, defendant's representative called the doctor's office and inquired whether the notes were transcribed as the handwritten ones could not be read. The doctor's office responded that they were not transcribed but the doctor would return the call. (AR 229.) Defendant's call log indicates that Dr. Haber called back and the notes of that call indicate that Dr. Haber has been treating plaintiff for the implant for 15 years and plaintiff has always had a problem with healing; Dr Haber estimated an improvement or another surgery within the next six months. (AR 232-33.)

At its request, defendant received further treatment notes of Dr. Haber first through June 16, 2004 and then again through July 23, 2004. After the receipt of the latter, the record indicates that vocationally, there was a need to clarify the physical demands of plaintiff's occupation as she

indicated she is on her feet all day long and once there was a clarification the attending physician should be asked to clarify functional capacity.  (AP 285.)

In August 2004, Dr. Brock, defendant's medical director wrote to Dr. Haber inquiring as to nonsurgical treatments, any consultation with physical rehabilitation or pain management specialists and plaintiff's current and potential future functional abilities.  Thereafter, Dr. Brock and Dr. Haber spoke.  According to the August 23, 2004 letter memorializing the conversation, which letter Dr. Haber counter-signed, plaintiff has had foot problems beginning approximately 20 years ago with bunion surgery and a history of multiple surgical procedures on both feet.  Her October 2003 surgery was for removal of an old implant and placement of a new one.  While plaintiff had improved compared to last presurgical patterns, she still has ongoing problems since that surgery most likely related to synovitis or scar.  Surgical options were discussed with plaintiff but Dr. Haber recommended conservative treatment first.  Plaintiff was to have a physical therapy regimen of 4 to 6 weeks.  Plaintiff has full time sedentary work capacity such as working at a desk but she should not do more than occasional walking/standing and avoid excessive bending of her knees and ankles while standing, stooping or walking.  (AR 300-01.) On October 14, 2004, defendant received another copy of the August 23, 2004 letter from Dr. Haber, this time with an addendum dated as of 10/14/2004, which read: "I recently examined Ms. Schussheim in New York on 10/13/04 she does not have full time work capacity.  Has difficulty ambulating and pain when sitting or standing or resting. Her pain is constant and has not improved with physical therapy.  If conservative treatment is not successful, then more aggressive measures (surgery) will be necessary." (AR 314-15.)

In February 2005, defendant advised plaintiff that it needed updated medical records and also that it had determined that it would be helpful to have a field representative meet with her to discuss her condition and medical treatment in person and therefore a representative would be contacting her. (AR 352.) Updated records were received from Dr. Haber in March 2005 and indicate that after October 2004 his notes were based on telephone conversations with plaintiff. (AR 375-382.)

Plaintiff meet with the field representative on May 5, 2005 [1] at a Starbucks store in Oceanside, NY, where the representative lived although he offered to drive to her town. According to the field representative's notes, the meeting was scheduled for 6:00 pm but at 5:30 plaintiff called and said she was stuck in traffic and would be late; she arrived at 6:20 dressed casually in jeans, sweater, jacket and old sneakers and ambulated with a normal gait. She did not allow the interviewer to take a photo of her right foot. The interview lasted 90 minutes during which plaintiff was able to tolerate sitting and occasionally elevated her right leg on an adjacent chair. With respect to her occupational duties, the field representative's notes recite that plaintiff explained she worked on malpractice litigation but did not have any trial duties. Her job duties were making court appearances to set up discovery schedules, file motions and compliance conferences, as well as handle some depositions. According to the representative, she was unable to provide a detailed breakdown of her job duties and stated she could not quantify the time she spent in court versus the time in her office. With respect to her medical condition, the

---

[1] According to the field representative notes, he first contacted plaintiff on March 22, 2005. She returned his call on April 3, 2005 and stated her time was consumed with visiting her sick mother in the hospital and would call back to arrange a meeting after her mother was discharged. On April 13, 2005 plaintiff called the field representative and requested that the meeting not occur until after the upcoming Passover holiday. (TR 400.)

investigator wrote that plaintiff was unable to provide the diagnosis why she is disabled but replied she has had many right foot surgeries and when pressed stated around ten and was unable to recall when she had surgeries prior to October 2003 but that Dr. Haber had performed all of them. She stated that she gets a ride to see Dr. Haber in either New York or New Jersey and that her last visit with him was approximately 4 weeks ago. Plaintiff refused to quantify the amount of time she can tolerate sitting, driving, standing and walking or the amount of weight she can carry or lift. (AR 399-403.)

On August 17, 2005, defendant's representative, Carol Romano, RN, spoke with Dr. Haber. According to the letter confirming that conversation, when asked about plaintiff's current physical capacity, Dr. Haber replied she certainly has full time sedentary capacity and can walk and that this included his consideration of her reported pain level; while she has swelling and discomfort if standing for long periods, she is able to stand and had the capacity to walk up to 1/3 of an eight hour day. According to letter, which was countersigned by Dr. Haber, Dr. Haber did not consider plaintiff disabled. (AR 412-413.)

First Unum obtained a vocational evaluation of plaintiff from Deede DeLay, Ph.D. in August 2005. (AR437.) Dr. DeLay determined that plaintiff had "full-time sedentary work capacity," and that plaintiff was "able to stand and walk for up to 1/3 of an 8 hour workday." (Id.) Dr. DeLay observed:

> Occ Clarification: An occ clarification in the file was completed by Norma Parras on 7/28/04. This was defined as sedentary but with frequent walking, occasional standing. This was based on 0 Net information and from the limited information in the file. The field report provides additional details about her occupation. She states she does not perform trial work but does perform depositions, goes to court to set up the discovery schedule, file motions and compliance conferences.

> Update: Using a more recent resource which includes the e-DOT, this is a sedentary occupation. The duties described by the claimant, although include walking/standing, are consistent with this definition. This includes standing and walking duties performed overall on an occasional basis in an 8 hour day.

(Id.)

By letter dated August 23, 2005, First Unum notified plaintiff that it was not able to approve further benefits. The letter began:

> [O]ur review was in accordance with the following definition of disability:
>
> Disability and disabled mean that because of injury or sickness:
>
> > 1. you cannot perform each of the material duties of your regulation occupation; or
> > 2. you, while unable to perform all of the material duties of your regulation occupation on a full-time basis, are:
> > > a.  performing at least one of the material duties of your regulation occupation or another occupation on a part-time or full-time basis; and
> > > b.  earning currently at least 20% less per month than your indexed pre-disability earnings due to that same sickness or injury.
>
> Note: For attorneys, "regular occupation" means the specialty in the practice of law which you were practicing just prior to the date the disability started."
>
> Please note, you are insured for your occupation of Attorney as it exists in the national economy.  Also, you are not insured for job availability or for any issues of commuting to and from a workplace.

(AR423.)  The letter then reviewed the most recent information received from Dr. Haber, as well as from telephone conversations with plaintiff and the field evaluation and went on to state:

> Based on our review of your file we note that you are claiming an impairment due only to your right foot condition.  We understand that you have several surgical procedures on your right foot.  Your physician indicates that you have made a recovery from these

9

> procedures, that you are doing quite well and that he does not
> consider you to be disabled. He provides the following as your
> work capacity: Can perform full time sedentary work and can
> stand/walk up to 1/3 of an 8 hour workday. We feel these
> restrictions and limitations are reasonable. These restriction and
> limitations do not preclude you from performing your seated
> occupation of Attorney. As the medical information in your file no
> longer supports an impairment precluding you from performing
> your occupation your claim with us is closed.

(Id. at 426-27.)

After messages were left for plaintiff on August 23 and 24, 2005, defendant's representative spoke to her on August 24 and verbally advised her that Dr. Haber indicated "she could do full time seated occupation and occasional stand/walk up to 1/3 of an 8 hour day" and based on this information, plaintiff was no longer impaired and claim has been closed. (AR 443)

On August 25, 2005, defendant's representative received a telephone call from Dr. Haber. According to the notes of that conversation, Dr. Haber was advised that plaintiff was never told Dr. Haber said she could stand 8 hours; rather she was told that he indicated she could do seated work and stand/walk on an occasional basis. The notes then continue:

> - He said "She wants to be on disability."
>
> - He reiterated that she can sit and is able to stand and that yes she could stand up to 2 hours per day but not for 2 continuous hours, but yes, she could stand for 2 hours throughout the day.
>
> -Discussed the duties of her occupation. Expl[aine]d that her occupation is a seated occupation and based on her condition as he described above, she is not disabled from her own occupation and her claim is closed.
>
> -He said "She may need another procedure on her right foot but nothing is planned right now."
>
> -He said he has been dealing with her for years.

-He said that she will harass us. He said she will also make his life difficult. I said I will gladly try and answer her questions.

-He said we may want to consider an IME. Expl[aine]d her claim is closed at this time. Reviewed her option of appealing. If she submits appeal request, her file would go to our appeals area and they would proceed accordingly and determine what review or actions were needed.

-He said 'Between me, you and the lamp-post, she wants to be on disability."

Advised again that I sent letter via fax to office - that it was part of our decision letter to her with his medical information. Said if he has any questions on it to call me. He asked if it required a response and I said no. It was only to verify to him how we communicated information to [plaintiff].

(AR 463-464.)

That same day, plaintiff called defendant and stated, inter alia, what defendant was saying was wrong and she was going to call Dr. Haber again. Defendant then received a faxed letter from Dr. Haber, dated August 25, 2005, in which he sought to clarify the matter. First, no surgery was planned "at this time" because plaintiff could not have surgery now but that it was planned for the future to remove scar tissue and reset the implant. Second, "because [plaintiff] could only walk up to 1/3 of an 8 hour day, she remain[ed] disabled. By no means do I consider her not disabled based on her subjective and objective complaints and condition." (AR 470.)

On September 2, 2005, Dr. Haber wrote a follow-up letter to his August 25, 2005 letter, to again clarify that plaintiff was "not doing all that well and w[ould] require surgery in the future," and that he "never meant to imply that she [wa]s not disabled." (AR516.) Dr. Haber further stated: "It is my fault that I did not correct your statement that 'I do not consider her disabled.' " (Id.) Dr. Haber concluded that plaintiff "ha[d] been and still remain[ed] disabled."

(Id.)  Plaintiff also submitted new medical information to First Unum about her foot, and informed First Unum for the first time that she had a hernia.  (AR479.)  On September 15, 2005, plaintiff spoke with a Vice President at First Unum who stated that "many types of roles exist in the [legal] profession, some sedentary such as tax or research roles[,] and suggested that [First Unum] clarify her specific role/duties." (AR 530-31.)  Plaintiff responded, "[N]ot me, babe[.]  I am not a tax attorney.  I run around to courts."  (AR530.)  Plaintiff further stated that at least half of her time was "spent traveling around to different courts."  (Id.)

On September 20, 2005, upon reviewing the medical evidence, Dr. Brock observed that "Dr. Haber 'never recanted his opinion that claimant would be capable of walking at least one-third of an eight-hour day.' "  (AR 536-37.)  Dr. Brock then concluded that plaintiff's complaints of difficulty walking and pain were inconsistent with the observations made during her field interview, and that the available information did not explain why plaintiff had not recovered from her surgery to at least the same functioning level she had maintained prior to her surgery when she had been working.  (Id. 539.)  Dr. Brock recommended an independent medical examination ("IME") (Id. 540).

Based upon his recommendation that further investigation be conducted, First Unum re-opened plaintiff's claim "under a reservation of rights."  (Id. 542.)   Plaintiff was advised of the reopening of her claim by letter dated October 5, 2005, which letter also specified additional information that was needed. (AR 542-545.)  The records reflects that thereafter plaintiff forwarded additional medical information to the defendants. (E.g. AR 566-603.)

## II. Information Received After the Reopening of the Claim

In August 2007, Dr. Haber informed First Unum that more than a year had passed since he last examined plaintiff. (Id. 49.) In December 2007, defendant had another doctor, Dr. Stephen Leverett, review the medical evidence. He "concluded that the records Schussheim had provided regarding her foot did not support her claim, and that Dr. Haber had confirmed that her foot did not preclude full-time sedentary work." (Id. 50, 51.) Dr. Leverett also determined that "no treating physician had imposed any restriction or limitation on [plaintiff's] work due to [her] hernia or related surgeries." (Id. 70.)

Dr Leverett spoke to Dr. Haber in January 2008. According to the letter memorializing the conversation, Dr. Haber sees plaintiff about once a year and last saw plaintiff in September 2007 at which time he did not recommend further surgery on her feet but as last resort he might do a fusion or remove the implant, which plaintiff declined. Dr. Haber opined that plaintiff had full time sedentary capacity. ( AR 1200-01.) In response to that letter Dr. Haber wrote back that no surgery was recommended because she was suffering from complication of general surgery but surgery was recommended "for the future due to her ongoing complaints of pain, burning, paresthesias, scar tissue and chronic swelling." He continued that with respect to full time sedentary capacity, he "assumed you understood that I meant she could sit for an extended period of time but that any walking, stooping, bending or lifting would be extremely limited. Getting to and from work would just exacerbate her already fragile condition and result in more pain and swelling. Walking or standing for any period of time results in extreme discomfort and the need to get off her feet. It is for these reasons that she remains disabled." (AR 1203.)

An IME of plaintiff was conducted on March 24, 2008[2] by Dr. John Zboinski, whose speciality is podiatry (AR 1232).  Upon physical examination, numerous scars were noted on both feet in the forefront area.  There was no evidence of hypertrophic scar formation; no waxy appearance, erythema or allodynia noted; and no open lesions or signs of infection.  According to the doctor, "[u]pon attempted palpation and examination of the feet, the claimant exhibited exaggerated responses to the most delicate palpation of her feet.  Any attempts at assessing range of motion was met with complaints of pain."   Plaintiff provided Dr. Zboinski with x-ray from Dr. Haber dated September 25, 2007 which were weightbearing anteroposterior and lateral views of each foot.  "Noted were grommets, with an implant of the right first MTP with bone callus of the lesser metarsals secondary to previous osteotomies.  Hypertrophic bone formation was noted." (AR 1316.)  In his summary, Dr. Zboinski wrote that plaintiff could not quantify her foot pain but stated it was chronic and persistent and that she was not forthcoming in answering direct questions and was reluctant to answer questions regarding her medications and employment.  He noted "inconsistencies between her observed gait when entering and leaving the examination room and when she was asked to ambulate during the physical exam without shoes.  Dr. Zboinski opined that plaintiff "is capable of working as an attorney in a sedentary type of position. . . . Sedentary work is defined as exerting up to 10 lbs of force occasionally, up to one-third of the time and a negligible amount of force to lift, carry, push and pull, or otherwise move objects, including a human body.  Sedentary work involves sitting most of the time, but may involve

_____

[2] From the record it appears that the delay in conducting the IME was due, at least in part, to plaintiff undergoing hernia surgery and complications arising therefrom (AR 1084-85.).  Although the administrative record contains information regarding this surgery and the resultant complications, it will only be discussed on a limited basis as it is not a separate claim but rather "merely a basis for the rescheduling of the IME." (Pl. Mem. (DE 67) at 6.)

walking or standing for briefs periods of time. Jobs are sedentary if walking and standing are required only occasionally, and all other sedentary criteria are met. I believe this was evidenced through direct observation of the claimant carrying shopping bags and a large purse, and walking briskly in and out of the exam room." (AR 1317.)

First Unum wrote to plaintiff on May 14, 2008 to give her " a final" thirty days to provide any evidence of restrictions and limitations (AR 1365-66.) Plaintiff provided a handwritten note from a physician whose name was redacted stating the plaintiff continues to have right groin pain and that she will limit her activities in accordance with her pain. (AR 1372.)

Defendant received a letter dated June 3, 2008 from Dr. Haber stating he had reviewed Dr. Zboinski's report. While conceding that there is no hypertrophic scar formation, he wrote that plaintiff has a long history of "painful fibrosis in the right first interspace which causes a lot of swelling, erthema and pain when she is ambulatory and non-ambulatory. She ambulates with an appropriate gait since she is incapable of pushing off on the right great toe." Dr Haber opined that plaintiff "does not have a fully functional right foot at this time and continued to remain disabled." (AR 1371.) The letter does not indicate when Dr. Haber last examined plaintiff. (*Id.*)

In June and July 2008, defendant had Drs. Leverett and Dillihunt conduct reviews. Dr. Leverett concluded the evidence was not sufficient to support a conclusion that plaintiff was disabled from sedentary work. (AR 1377-78.) Dr. Dillihunt, board certified in general surgery, concurred with Dr. Leverett's evaluation and stated that Dr. Leverett's conclusions were valid based on the limited information available. (AR 1388.) Norma Parras-Potenzo, a vocational rehabilitation consultant, then determined that the restrictions and limitations Drs. Leverett and Dillihunt found reasonable would not prevent plaintiff from completing her occupational duties

with an ergonomic work station to allow for positional changes to mitigate discomfort in the groin area.  (AR 1395-96.)

### III.  The Termination of Plaintiff's Benefits and Subsequent Appellate Review

In a seven-page letter, dated July 28, 2008, First Unum notified plaintiff that it was terminating her benefits.  First Unum stated that although " 'there [wa]s no verifiable medical data to explain [her] extreme pain complaints, [it] did consider [her] subjective reports and found them inconsistent and unreliable."  Plaintiff was informed that First Unum would reconsider her claim if she provided additional information to support her claim, and her right to appeal the decision was explained in the letter.  (AR1406 -12.)

On August 30, 2008, plaintiff administratively appealed First Unum's decision.  (AR 1436-39.)  Plaintiff submitted three additional letters in support of her appeal.  One letter, dated August 19, 2008, was from Dr. Haber, stating that "'she [could not] stay on her feet for any extended period of time without complaints of severe pain. " The letter does not indicate whether or not Dr. Haber's conclusions were based on an examination of plaintiff.  Another letter was from an unnamed abdominal doctor, stating that plaintiff suffers from pain and swelling in her lower abdomen due to old hernia surgery and that activity exacerbated "the areas of pain and swelling," and, "[a]s a result, she absolutely [had to] restrict her activities[:] no heavy lifting, minimal bending over and sitting with her legs elevated daily. " The third letter was from a Dr. Varriale stating that plaintiff could not "walk for more than 30 minutes" because "she [would] ha[ve] significant pain the next day" when she did.  (AR1438-40, 1460.)  However, when First Unum asked plaintiff to provide it with Dr. Varriale's medical records, she stated that First Unum had "everything that there [wa]s," and that "Dr. Varriale ha[d] *not* operated on [her] and

ha[d] *not* been [her] foot doctor."  Rather, he "was consulted for his opinion on the condition of her feet, just as you used Dr. Zboinski . . . ."  (AR1477-78.)

By letter dated September 16, 2008, First Unum acknowledged plaintiff's appeal.  It advised plaintiff that, as it did not have her authorization to obtain further medical information, if there was additional information she wanted considered, she should forward it within ten days.  It further requested that as it was unclear whether plaintiff had applied for Social Security disability benefits, she should provide the status of any application, provide a copy of any award, or confirm that she had not so applied. (AR 1455.)

 As part of the appeal process, Dr. Joel B. Hoag, board certified in orthopedic surgery, reviewed the medical evidence for First Unum.  Dr. Hoag observed that plaintiff had "allowed extremely limited disclosure and permission accessing her medical treatment[, and] [a]s such[,] any conclusions [we]re limited and based solely on the medical notes contained in th[e] file." (AR1526.)  He determined that plaintiff was not restricted or limited by her hernia, "ha[d] a normal gait and [wa]s able to ambulate without aid or assistance," and "could perform sedentary work, walk up to one-third of the day (as Dr. Haber had opined), and walk for up to thirty minutes at a time (as Dr. Varriale had opined)."  Dr. Hoag noted that plaintiff was "seen yearly, " which evidenced a "stable, chronic condition, not requiring physician (podiatric) interventions." (AR 1529.)

Dr. Byard, Senior Vocational Rehabilitation Consultant, concluded, based upon Dr. Hoag's analysis of plaintiff's restrictions and limitations, that plaintiff was not precluded "from performing the duties of her regular occupation" and that the use of a protective shoe and/or ambulatory assistance device would not preclude the performance of attorney occupation."  (AR

1532.)  Dr. Byard observed that plaintiff's occupation, "[a]s generally performed, . . . call[ed] for a 'Sedentary' level of physical assertion, as that term [wa]s defined by the Dictionary of Occupational Titles ["DOT"]."  (*Id.*) According to Dr. Byard, plaintiff's "work typically require[d] a 'frequent' level of sitting as well as an 'occasional' level (up to 1/3 of the day) of standing and/or walking throughout the work day."  (*Id.*)

In a letter dated November 20, 2008, plaintiff was informed by First Unum that it was upholding its prior decision to terminate her benefits.  (AR 1554-59.)  In addition to describing the independent medical and vocational reviews that First Unum had performed during its consideration of plaintiff's appeal, First Unum informed Plaintiff that it had recently learned that plaintiff had filed lawsuits alleging personal injuries resulting from car accidents in July 2004 and November 2004 which personal injuries prevented her from working.  (AR1556-57.)  First Unum observed that those "allegations were inconsistent with Schussheim's claim that she had been disabled since October 2003."  (AR 1556.)   The letter concluded that plaintiff had "not submitted sufficient proof that [she was] unable to perform the material and substantial duties of an attorney as of July 28, 2008."  (AR1556).)  Plaintiff was given time to provide additional information to ensure that First Unum's decision was based upon an accurate record.  (AR1559.)

In March 2009, plaintiff provided First Unum with new information, including (i) a letter from Dr. Haber again stating that Plaintiff was disabled; (ii) a letter from McAloon, plaintiff's former employer, stating that plaintiff "attended court conferences in many different venues, examinations before trial outside of the office and meetings with experts outside of the office" and "[t]herefore her position required frequent travel rather than sedentary office work"; and (iii) a letter written by an unnamed doctor stating that reconstructive surgery had been performed on

plaintiff's right groin on March 19, 2009, and that "[s]he needed to rest; all her activities and travel [we]re limited at th[at] time." (AR 1721, 1723, 1725.) However, plaintiff told First Unum that she would not provide them with the name of her abdominal surgeon because First Unum had violated HIPAA laws in the past. (AR1781.)

Dr. Byard determined that McAloon's letter did not "change the vocational conclusions reached in the prior Appeals Vocational Review of 10/31/08." (AR1778-79).) According to Byard, "the classification of an occupation as sedentary acknowledges a mix of sitting and standing/walking activities throughout the workday such that the latter activities may comprise up to one-third of the day." (AR1779).) Byard thus concluded that plaintiff's "traveling to, or participating in, meetings or depositions would not affect this analysis" because "[m]eetings and depositions are typically conducted in a seated posture," and the "amount of time spent traveling to these events and the actual time spent standing and/or walking . . . would not typically rise to more than "occasional" level- (from 0 to 1/3 of the work day as per the DOT). " (AR1779).)

In a letter dated May 18, 2009, First Unum notified plaintiff that it "ha[d] completed a review of [her] appeal," and that it was upholding the prior appeal determination, and "[n]o further review [wa]s available and [he]r appeal [wa]s . . . closed." (AR1806.) First Unum stated that "Dr. Haber's 'clarification' [of his prior statement that plaintiff had full-time sedentary capacity, did] not appear to be based on any testing or independent assessment, rather, it seem[ed] to be based on self-reported statements from [plaintiff]," and "Dr. Haber's previous conclusion [that plaintiff could work full time], on the other hand, [wa]s consistent with the conclusion of the [IME that she was] capable of working [as] an attorney in a sedentary type position." (AR1805.) First Unum concluded that because it was unable to confirm with the

treating providers the authenticity of medical records provided by plaintiff and the limitations or restrictions related to her medical conditions, it had to rely on the IME results, which found that plaintiff was able to perform full time sedentary work.  (AR1806.)

After commencing the present action on November 9, 2009, plaintiff applied for Social Security Disability Insurance ("SSDI") benefits from the Social Security Administration ("SSA"), and her claim was granted in November 2010.  (Def.'s 56.1 ¶ 120.)  As a result, plaintiff requested First Unum to reopen and reconsider her claim; however, First Unum denied plaintiff's request.  (*Id.* ¶¶ 121, 122.)

## DISCUSSION

## I.      **Summary Judgment Standard**

Summary judgment, pursuant to Rule 56, is appropriate only where admissible evidence in the form of affidavits, deposition transcripts, or other documentation demonstrates the absence of a genuine issue of material fact, and one party's entitlement to judgment as a matter of law. *See Viola v. Philips Med. Sys. of N. Am.*, 42 F.3d 712, 716 (2d Cir. 1994).  The relevant governing law in each case determines which facts are material; "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  No genuinely triable factual issue exists when the moving party demonstrates, on the basis of the pleadings and submitted evidence, and after drawing all inferences and resolving all ambiguities in favor of the non-movant, that no rational jury could find in the non-movant's favor.  *Chertkova v. Conn. Gen'l Life Ins. Co.*, 92 F.3d 81, 86 (2d Cir. 1996).

To defeat a summary judgment motion properly supported by affidavits, depositions, or other documentation, the non-movant must offer similar materials setting forth specific facts that show that there is a genuine issue of material fact to be tried. *Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996). The non-movant must present more than a "scintilla of evidence," *Del. & Hudson Ry. Co. v. Consol. Rail Corp.*, 902 F.2d 174, 178 (2d Cir. 1990) (*quoting Anderson*, 477 U.S. at 252) (internal quotation marks omitted), or "some metaphysical doubt as to the material facts," *Aslanidis v. U.S. Lines, Inc.*, 7 F.3d 1067, 1072 (2d Cir. 1993) (*quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)) (internal quotation marks omitted), and cannot rely on the allegations in his or her pleadings, conclusory statements, or on "mere assertions that affidavits supporting the motion are not credible." *Gottlieb v. Cnty. of Orange*, 84 F.3d 511, 518 (2d Cir. 1996) (internal citations omitted).

The district court considering a summary judgment motion must also be "mindful . . . of the underlying standards and burdens of proof," *Pickett v. RTS Helicopter*, 128 F.3d 925, 928 (5th Cir. 1997) (citing Anderson, 477 U.S. at 252), because the "evidentiary burdens that the respective parties will bear at trial guide district courts in their determination[s] of summary judgment motions." *Brady v. Town of Colchester*, 863 F.2d 205, 211 (2d Cir. 1988). "[W]here the nonmovant will bear the ultimate burden of proof at trial on an issue, the moving party's burden under Rule 56 will be satisfied if he can point to an absence of evidence to support an essential element of the nonmoving party's claim." Id. at 210-11. Where a movant without the underlying burden of proof offers evidence that the non-movant has failed to establish her claim, the burden shifts to the non-movant to offer "persuasive evidence that his claim is not 'implausible.' " Id. at 211 (citing *Matsushita*, 475 U.S. at 587).

21

## II.    Standard of Review

As a threshold matter, the Court must determine the appropriate standard of review to apply to First Unum's denial of plaintiff's claim for LTD benefits.  The Supreme Court has made clear that "a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989); *see also Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 111 (2008); *Kinstler v. First Reliance Standard Life Ins. Co.*, 181 F.3d 243, 249 (2d Cir. 1999).  If such discretion is given, a district court must review the administrator's denial of benefits deferentially, and may reverse only if the administrator's decision was arbitrary and capricious.  *See Kinstler*, 181 F.3d at 249.

The parties agree that the LTD Plan vested First Unum, as the administrator, with sufficient discretionary authority such that an arbitrary and capricious standard of review is appropriate.  (See Def.'s Mem. at 18; Pl.'s Mem. in Opp'n at 3.)  Under the arbitrary and capricious standard of review, the Court may overturn a decision to deny benefits only if it is "'without reason, unsupported by substantial evidence or erroneous as a matter of law.'" *Kinstler*, 181 F.3d at 249 (quoting *Pagan v. NYNEX Pension Plan*, 52 F.3d 438, 442 (2d Cir. 1995)). "Substantial evidence is such evidence that a reasonable mind might accept as adequate to support the conclusion reached by the [administrator and] . . . requires more than a scintilla but less than a preponderance." *Celardo v. GNY Auto. Dealers Health & Welfare Trust*, 318 F.3d 142, 146 (2d Cir. 2003) (quoting *Miller v. United Welfare Fund*, 72 F.3d 1066, 1072 (2d Cir. 1995)).  This scope of review is narrow, and the Court may not substitute its own judgment for

that of the decision maker.  *Pagan*, 52 F.3d at 442; *see also Jordan v. Ret. Comm. of Rensselaer Polytechnic Inst.*, 46 F.3d 1264, 1271 (2d Cir. 1995) ("The court may not upset a reasonable interpretation by the administrator.").  Thus, "[t]he question before a reviewing court under this standard is 'whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.' "  *Jordan*, 46 F.3d at 1271 (quoting *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 285 (1974)).  Moreover, in its narrow review, the Court may not consider evidence beyond the administrative record, but should consider only the information presented prior to the administrator's final determination.  *Miller*, 72 F.3d at 1071; *Klecher v. Metro. Life Ins. Co.*, 2005 WL 1337509, at *8 (S.D.N.Y. June 6, 2005), *aff'd*, 167 F. App'x 287 (2d Cir. 2006).

## III.    Summary of Arguments

Schussheim seeks resumption of her benefits retroactive to July 28, 2008 on the grounds that defendant's termination of those benefits was arbitrary and capricious.   She maintains that defendant failed to focus on her material duties as an active litigation attorney for a medical malpractice firm as required by the policy, arbitrarily used broad physical descriptors such as sedentary rather than her daily tasks and used an inconsistent definition of sedentary.  She further argues that defendant improperly drew negative inferences based on plaintiff's purported refusal to provide unaltered authorizations.  Finally, plaintiff asserts that in evaluating whether defendant acted arbitrarily and capricious the court should consider that defendant is internally conflicted as it both evaluates and pays benefit claims and that defendant has an abusive past history. Defendant counters that the conflict should not be given any weight because there is no evidence that it affected the claims determination and because First Unum paid benefits for more than four

years, assigned multiple individuals to review the claim, and spoke to Dr. Haber.  Moreover, First Unum maintains its evaluation of plaintiff's regular occupation was reasonable.

Plaintiff also seeks reopening of her claim for consideration of the November 2010 SSA award on the grounds that the failure to consider it was in violation of defendant's Benefits Center Claims Manual and argues that under its claim manual, defendant was required to give the award significant weight in its disability determination.  Again, defendant maintains that its decision was reasonable as reopening of the claim was not required by its manual.

## IV.    First Unum's Termination of Benefits was not Arbitrary or Capricious

The Court turns first to plaintiff's argument that First Unum acted arbitrarily and capriciously by "using general definitions and vague physical descriptors" to evaluate her claim, even though the Policy's enhanced definition of "regular occupation," and First Unum's Claims Manual, "clearly require[d] a detailed exploration of plaintiff's job-specific tasks."  (Pl.'s Mem. in Opp'n at 21.)  Plaintiff argues that despite the Policy's enhanced definition of disability for attorneys, First Unum "focused not on Ms. Schussheim's material duties as an active litigation attorney for a medical malpractice firm, but on a mythical and amorphously defined 'attorney' utilizing 'Dictionary of Occupational Titles' and other broad-based descriptions that bear no relationship whatsoever to Ms. Schussheim's actual duties."  (*Id*.)  Plaintiff maintains that First Unum defined plaintiff's occupation with the physical descriptor, "sedentary," rather than based upon her daily tasks and erroneously "defin[ed] her occupation as it is performed in the 'National Economy.' "  (*Id*. at 10-11.)

First Unum concedes "that the Policy insured against Schussheim's inability to perform the duties of her regular occupation, which 'means the specialty in the practice of law which [she

was] practicing just prior to the date the disability started." (Def.'s Mem. in Opp'n at 10 (quoting AR102).) Moreover, First Unum concedes that "Schussheim's specialty in the practice of law prior to her disability was medical malpractice, excluding trials." (*Id*. (citations omitted).) However, First Unum disputes plaintiff's contention that her "job at McAloon" is the same as her "regular occupation [of Medical Malpractice Attorney] under the Policy." (*Id*. at 10.) First Unum also defends its use of DOT and strength ratings to evaluate plaintiff's claims, arguing that use of DOT and strength ratings is acceptable practice, "especially when combined with claim specific information." (*Id*. at 12.)

In this case, the Claims Manual provides insight as to the extent First Unum was permitted to rely on sources, such as the DOT, to assist in defining plaintiff's regular occupation, as well as to the extent First Unum was required to obtain information from plaintiff to determine her actual job duties and requirements. The Claims Manual section entitled, "Evaluation of Occupational Duties (Physical Work Intensity Descriptors)," states, in relevant part:

> Disability is evaluated on the specific tasks that comprise an insured's occupation. It is not evaluated solely on the insured's ability to perform at a certain level of physical work intensity (such as sedentary, light, medium and heavy).
>
> Physical work intensity descriptors may:
> • be defined differently by different organizations, physicians, etc., and
> • not provide an accurate reflection of the specific work requirements or the occupational duties at issue.
>
> Therefore, the use of physical work intensity descriptors should:
> • be avoided as a substitute for a specific and detailed description of the occupational duties; or
> • be followed by a description of the specific work duties being considered as they pertain to the occupational duties.

25

For the remainder of this document, the terms "occupation" and "occupational duties" refer to the specific contract definitions regarding occupation and occupational duties (own occupation, any occupation, material and substantial duties, important duties, etc.).

**Reminder: Each claim is unique and should be evaluated on its own merits. The actual contract governing the claim must be referenced.**

**Procedure:**
When conducting an independent verification of occupational duties, do not limit the analysis solely to the insured's ability to perform at a certain level of physical work intensity. Focusing solely on the insured's ability to perform at a certain physical intensity level may not take into consideration the full extent of insured's ability to perform his/her occupational duties, e.g., due to impaired manual dexterity, impaired cognitive function, etc.

When conducting an independent verification of occupational duties, consider the following:
- Physical work requirements;
- Cognitive work requirements;
- The skills required to perform the specific tasks of the occupation; and
- Possible accommodations that will enable the insured to perform specific tasks by alternative means.
- 

The following tools/resources may be helpful when conducting an independent verification of occupational duties:
- JD and/or JA provided by the employer.
- The insured's description of his/her occupational duties.
- VRCs
- Reference materials provided by VRCs, such as the:
- O*NET,
- Occupational Outlook Handbook,
- Guide to Occupational Exploration, and
- Dictionary of Occupational Titles.

If the VRC provides an opinion on the occupational duties, and/or if vocational tools such as O*NET were referenced, document the file accordingly.

(Exh. 14 to Friedman Dec. at 1-2.)

Although use of physical work intensity descriptors is discouraged by the Claims Manual when a specific and detailed description of the occupational duties is available, here, the evidence reveals that plaintiff did not cooperate with First Unum by providing specific and detailed descriptions of her occupational duties. Instead, plaintiff provided non-specific, unquantified, or contradictory descriptions, such as that: "she r[an] around to courts, ma[de] court appearances, [and did] depositions," and was "always on the go" (AR62); she "ha[d] to go to depositions[,] . . . assist[] in motions[,] and . . . appear in court frequently" (AR90); "she [wa]s on her feet all day long" (AR285); "[a]t least half [her] time [wa]s spent traveling around to different courts" (AR531); "her profession . . . was demanding and physically active" (AR1484); and that she "was unable to provide a detailed breakdown of her job duties," and could not "quantify the extent of her job duties or the time she spent in court versus the time in her office" (AR401).

Plaintiff argues that although she did not provide specific examples of her occupational duties, such as that she was required to "climb steps or stand[] in a subway car," First Unum could have made "real-world inferences" to that effect. (Pl.'s Mem. in Reply at 8.) However, the Claims Manual, which plaintiff argues governed First Unum's actions, nowhere states that "real-world inferences" can or should be used to determine a claimant's occupational duties. Moreover, the Court does not agree with plaintiff that First Unum could have made "real-world inferences" based upon the information provided by plaintiff. For example, while plaintiff argues that First Unum "knew early on that [her] position was one that required frequent travel with the inescapable inference that numerous flights of steps would have to be negotiated on a regular basis," (Pl.'s Mem. in Opp'n at 18), the page of the Administrative Record cited to by plaintiff for this contention reveals that First Unum was informed only that plaintiff had "to go to

depositions[,] assist[] in motions and . . . appear in court frequently."  (AR 90.)  It is difficult to ascertain how First Unum should have inferred that plaintiff negotiated "numerous flights of steps . . . on a regular basis" merely because she attended depositions or appeared in court.

Furthermore, the cases plaintiff cites to support her argument that "real-world inferences" are permissible do not state any such proposition.  For example, *Zurndorfer v. Unum Life Inc. Co. of Am.*, 543 F. Supp. 2d 242, 245-46 (S.D.N.Y. 2008), contains citations to the record in that case to support the statement that the plaintiff "was frequently required to walk several blocks and navigate the stairs of the New York City subway system, often while carrying presentation materials or a laptop."  Significantly, the particular staircases at issue were identified as being New York City subway staircases.  *Id*.  In this case, on the other hand, plaintiff merely stated that she appears in court or at depositions, without identifying specific locations which would suggest that plaintiff was required to negotiate staircases.  In fact, it can equally be argued that First Unum could infer that plaintiff could use elevators and ramps at the subways, courthouses and deposition locations instead of negotiating staircases.  Most significantly, at no point in *Zurndorfer* did the Court state that the plaintiff's occupational duties in that case were determined based upon "real-world inferences."

While plaintiff faults First Unum for failing to obtain information regarding her occupational duties, the Court finds her position untenable considering that First Unum asked plaintiff to provide it with information regarding her occupational duties, and plaintiff substantially failed to do so, and, when she did provide information, as discussed above, it was in a less than enlightening fashion.  Indeed, the record discloses that when plaintiff "was reluctant to discuss her work history," and said that her work history "ha[d] nothing to do with her claim,"

First Unum "told her that [it] need[ed] to understand her job duties to assist [her] to evaluate her LTD claim." (AR401.) However, First Unum then noted that "Ms. Schussheim was unable to provide a detailed breakdown of her job duties . . . [and] stated that she c[ould] not quantify the extent of her job duties or the time she spent in court versus the time in her office." (Id.) In this case, plaintiff plainly attempts to use her failure to cooperate with First Unum as both a sword and a shield. Her failure to cooperate also violated the provision of her policy which required her to "give[] to the Company proof of continued . . . disability." (Exh. 15 to Friedman Dec. at L-BEN-1; *Id.* at L-GPP-2.) *See Young v. Hartford Life and Acc. Ins. Co.*, 506 F. App'x 27, 28 (2d Cir. 2012) (stating that an employee benefits plan administrator does not have the obligation to obtain readily available documentation prior to denying an appeal that challenges the termination of LTD benefits); *Wojciechowski v. Metro. Life Ins. Co.*, 1 F. App'x 77, 81 (2d Cir. 2001) (summary order) ("While appellant notes that [objective] test results could have been requested from [his doctor], it was appellant's burden under the Plan, not [the plan administrator's], to submit, at his own expense, proof of disability, satisfactory to [the plan administrator]." (citation and internal quotation marks omitted)).

Furthermore, contrary to plaintiff's argument that First Unum violated its protocol by failing to "follow[] up" with McAloon after it was recommended in June 2004 that First Unum call McAloon to receive clarification as to "the type of law in which [plaintiff was] practicing [and the] actual physical demand of her occupation," (AR 267; Pl.'s Mem. in Opp'n at 18), the Claims Manual did not mandate that First Unum seek clarification from plaintiff's employer. Defendant attempted to garner this information from plaintiff herself but received only non-specific answers. While plaintiff similarly faults First Unum for accepting McAloon's report of

29

"No job description available," which was submitted when plaintiff first filed her claim, plaintiff simultaneously acknowledges that she did not follow up with McAloon for more information for six years. (Pl.'s Mem. in Opp'n at 17.) Here, too, plaintiff improperly attempts to shift the burden of producing information to support her claim from herself, as the policy provides, to First Unum.

Most importantly, the Claims Manual did not require First Unum to assess plaintiff's claim based solely upon her job-specific tasks rather than with physical descriptors, contrary to plaintiff's assertion. While the Claims Manual recognized that the use of physical work intensity descriptors should be avoided when a specific and detailed description of the occupational duties could be used instead, it also provided, in the disjunctive, that when physical descriptors were used, they should be accompanied by a description of the specific work duties that were considered. (Exh. 14 to Friedman Dec. at 1.) Here, in addition to utilizing the physical descriptor "sedentary," as defined in the DOT, First Unum analyzed plaintiff's claim based upon the description of plaintiff's occupational duties that were provided by her and her former employer, i.e., that she attended court conferences and depositions, and filed motions. For example, Senior Vocational Rehabilitation Consultant, Norma Parras-Potenzo, determined that plaintiff "would be able to complete her occupational duties within the restrictions noted in [the] DMO review," based upon her evaluation of the DMO review,[3] in addition to plaintiff's statement that she "perform[ed] depositions, [and went] to court to set up the discovery schedule,

---

[3] The DMO review noted that Plaintiff "ha[d] the ability to exert up to 10 pounds of force occasionally, a negligible amount of force frequently to lift, carry, push, pull, or otherwise move objects," i.e., sedentary work (see AR1201), and that an ergometric workstation could be established to mitigate any discomfort in the groin area resulting from hernia surgery and resultant complications that Plaintiff experienced while sitting. (AR1395.)

file motions and [attend] compliance conferences." (AR1395-96.) Similarly, when Senior

Vocational Rehabilitation Consultant, Richard Byard, performed an occupational analysis, he

determined that plaintiff's "occupation call[ed] for a 'Sedentary' level of physical exertion, as that

term is defined by the Dictionary of Occupational Titles," and "conclude[d] that the physical

demands of the claimant's own occupation would not exceed her level of work capacity" and that

plaintiff "retain[ed] the requisite level of standing/walking capacity to perform her occupation."

(AR1531-33.) His conclusion was based upon a review of "the available occupational

information in the file," as well as plaintiff's "descri[ption of] her practice as being concentrated

in the medical malpractice field," and involving "participat[ion] in depositions and . . . court

appearances[,] as needed." (AR1532.)

   Plaintiff's argument that First Unum acted arbitrarily and capriciously because it "focused

not on Ms. Schussheim's material duties as an active litigation attorney for a medical malpractice

firm, but on a mythical and amorphously defined 'attorney' utilizing 'Dictionary of Occupational

Titles' and other broad-based descriptions," (Pl.'s Mem. at 10), fails for the simple reason that the

DOT's description of an attorney's duties coincides with plaintiff's description of her occupational

duties. Namely, the DOT's "Occupational Description" of "Attorney" provides that an attorney

"[c]onducts criminal and civil lawsuits, draws up legal documents, advises clients as to legal

rights, and practices other phases of law." (Exh. 8 to Friedman Dec. at 1.) It further states that

an attorney, inter alia, "interviews clients and witnesses," "[p]repares legal briefs," "[f]iles

brief[s] with court clerk[s]," and "[r]epresents client[s] in court and before quasi-judicial or

administrative agencies of government." (Id.) Analogously, plaintiff informed First Unum that

she "ha[d] to go to depositions[,] . . . assist[] in motions[,] and . . . appear in court frequently."

(AR90.)  Plainly, by considering the DOT's description of an attorney's occupational duties, First Unum was considering substantially the same occupational duties described by plaintiff for her specific practice area.

Consequently, because First Unum's Claims Manual did not mandate that it evaluate plaintiff's claim based solely upon a specific and detailed description of plaintiff's job duties, and because plaintiff did not assist First Unum by providing specific and detailed descriptions of her occupational duties, the Court finds that First Unum did not act arbitrarily and capriciously by assessing plaintiff's claim using physical descriptors and the DOT's definitions, in addition to the descriptions provided by plaintiff and her employer- a method expressly permitted by the Claims Manual.[4]

The court now turns to plaintiff's assertion that defendant Unum inappropriately drew negative inferences based upon her refusal to provide First Unum with unaltered authorizations or a list of her treating providers.  (Pl.'s Mem. at 21.)  According to plaintiff, First Unum "offered plaintiff the alternative of providing [First Unum with] the medical information it needed in lieu of authorizations," and plaintiff accepted the proffered alternative and complied with it.[5]   (Id.)

---

[4]  Although Plaintiff argues that First Unum improperly measured Plaintiff's occupational duties under a national standard rather than according to her "individual material duties," (Pl.'s Mem. at 10-11), the Claims Manual specifically states that "[a] job is a set of specific duties performed for a particular employer," whereas "[a]n occupation is a broader description of the type of work as it is generally performed in the national economy."  (Exh. 13 to Friedman Dec. at 3.)  Moreover, as discussed previously, the standard utilized by First Unum to measure Plaintiff's occupational duties nonetheless encompassed the particular material duties Plaintiff claimed were part of her occupation as a medical malpractice attorney.

[5]   Plaintiff asserts that the alternative arrangement was created as a result of First Unum's violation of HIPAA protocol, and her resultant reluctance to provide HIPAA authorizations because she no longer trusted First Unum.  (Pl.'s Mem. at 21.)  First Unum disputes plaintiff's contention that it violated HIPAA protocol as a matter of law.  (Def.'s Mem. in Opp'n at 6.)  Nevertheless, the focus of plaintiff's argument is on whether First Unum inappropriately drew negative inferences despite having agreed to let plaintiff directly supply it with medical records, and whether plaintiff failed to provide the necessary information, not whether First Unum actually violated HIPAA

Despite Plaintiff's assertion that she abided by the arrangement she reached with First Unum whereby Plaintiff would provide First Unum with the medical information it needed in lieu of providing authorizations, the Administrative Record reveals that Plaintiff did not provide First Unum with the information it requested.[6]  Plaintiff cites two specific instances in the record in which First Unum allegedly drew improper negative inferences.  In the first instance, First Unum wrote plaintiff a letter informing her that it was upholding its original decision to deny her claim.  (AR1554-59.)  In that letter, First Unum noted that it had paid benefits to plaintiff under a reservation of rights "because it had difficulty obtaining sufficient information from [her] to assess whether the pre-existing condition provisions of the policy applied to [her] claim." (AR1557.)  First Unum further noted that it had sent plaintiff a supplemental questionnaire, and an authorization to permit First Unum to obtain copies of her medical records to determine if plaintiff had received prior treatment, care or consultation for the condition for which she was claiming a disability; however, plaintiff notified First Unum during a telephone conversation that she "declined to provide information regarding the history of [her] condition."  (Id.)  The letter observes that plaintiff also told First Unum that she could not remember who had performed her

_____

protocol.  Accordingly, the Court need not address whether a HIPAA violation occurred.

[6]  Notably, First Unum argues that while plaintiff now asserts that " 'no physician other than Dr. Haber was treating [her] for her foot condition,' " (Def.'s Reply at 2 (quoting Pl.'s Mem. in Opp'n at 3)), on the contrary, plaintiff had told First Unum that: (1) "a team of surgeons all over the country and Europe had tried in the past to get her to be able to walk again" (AR 178); (2) "she was going to send her xrays to the famous surgeons in Europe who were going to be operating on her again" and "she has had dozens of surgeons examining her foot" (AR 181); and (3) "she w[ould] be having surgery in the fall [of 2005] and a team of docs including Dr. Haber w[ould] be doing it" (AR 479).  (Def.'s Reply at 2.)  Moreover, plaintiff "did not identify, or provide any medical records for[] any of those doctors."  (Id.)  In a similar vein, plaintiff stated that she had "no other physician . . . than Dr. Haber and no other conditions, only foot issues," (AR421), but then a week later informed First Unum that six weeks prior she had broken a bone in her left foot, and that she had been treated by a doctor other than Dr. Haber (AR479).  In addition, when First Unum inquired as to whether Dr. Haber knew of that injury, "she said no[,] then yes." (Id.)

original foot surgery, she was unsure how to spell the name of her treating provider, and she could not provide any contact information for the treating provider. (AR1557-58.) First Unum stated that it had considered plaintiff's "failure to provide information against information in the record that suggest[ed] that [her] claimed disability may well [have] be[en] a pre-existing condition as defined in the policy." (AR1558.) First Unum noted as an example, that "there [we]re suggestions in the record that [plaintiff's] podiatrist, Dr. Haber, ha[d] treated [plaintiff] for the past twenty years and that he ha[d] performed numerous 'surgeries' yet [plaintiff] declined to provide [First Unum] with his complete records or permit [First Unum] to obtain [the records itself]." (Id.) As a result of plaintiff's "failure to provide [First Unum] with complete information regarding [her] medical history, and [her] failure to provide [it] with authorizations that would enable it to obtain records regarding [her] treatment, [it] ha[d] drawn an inference that [she] did not provide the information because it would negatively impact [her] entitlement to benefits." (AR1559.)

Although plaintiff argues that she provided First Unum with all of the records it needed, and points to a letter she wrote to First Unum in which she claims that she provided them with all of the relevant information they needed (AR1659-61), as noted supra, First Unum repeatedly informed plaintiff that because it did not have authorizations from her to request medical records from her treating providers, plaintiff was responsible for providing First Unum with the necessary medical information to support her claim. In addition, in the first instance discussed above, First Unum determined that plaintiff had not provided all of the medical information it requested and required. Plaintiff does not dispute that she told First Unum that she could not remember who had performed her original foot surgery, that she was unsure how to spell the

34

name of her treating provider, or that she could not provide any contact information for the treating provider.

In the second instance cited to by Plaintiff, First Unum wrote a letter to plaintiff supplementing its determination on administrative appeal, and advising plaintiff that it had not given greater weight to Dr. Haber's opinion because it was "a conclusory statement" and plaintiff refused to allow First Unum "to directly obtain and review the contemporaneous records." (AR1803.)  The letter observed that plaintiff had inaccurately stated that she had given First Unum authorizations to obtain Dr. Haber's records, because the authorization that was given to First Unum was limited to obtaining only pharmacy records, and was further altered by plaintiff to limit the type and time period of the records obtainable.  (*Id.*)  The letter then stated that plaintiff's statement that Dr. Haber was required to keep records for only 7 years did "not address what records Dr. Haber ha[d]."  (*Id.*)  According to First Unum, "[t]he record indicated that Haber's last examination had been in 2007 (AR 1061, 1064), which undercut the validity of his opinions about Schussheim's condition in 2008 and 2009."  (Def.'s Mem. in Opp'n at 5.)  In addition, First Unum argues that Dr. Haber's opinions repeatedly provided that plaintiff was able to perform sedentary work and that she could stand and walk for up to one-third of the day, and Dr. Haber told First Unum that he was supporting plaintiff's claim because she would "make his life difficult."  (*Id.* at 6 (quoting AR 944).)  In sum, First Unum argues that Dr. Haber's "lukewarm support" provided "a sufficient basis to discount [his] assertions that Schussheim was disabled."  (*Id.*)

Plaintiff's argument attacking the weight given to Dr. Haber's opinion is unpersuasive. First Unum was not required to defer to Dr. Haber's opinions, see *Siemionko v. Building Serv.*

*32B-J Ben. Funds*, 2009 WL 3171955, at *8 (E.D.N.Y. Sep. 30, 2009) ("ERISA does not require

benefits plans to defer to the opinions of plaintiff's treating [physicians]"), nor was it

unreasonable for First Unum to give lesser weight to an opinion that was rendered without the

benefit of a current examination of plaintiff's condition.  Moreover, as First Unum argues, Dr.

Haber's other opinions supported its determination.[7]  In sum, because disputed opinions about a

claimant's medical condition "fall precisely within the discretion of the plan administrator to

resolve," the Court's job is only to assure that First Unum's "ultimate eligibility decision was not

so lacking in 'reason, unsupported by substantial evidence or erroneous as a matter of law' as to

have been made arbitrarily and capriciously."  *Kruk v. Metro. Life Ins. Co., Inc.*, 2014 WL

2055883, at * 2 (2d Cir. May 20, 2014) (summary order) (quoting *Miles v. Principal Life Ins.

Co.*, 720 F.3d 472, 485-86 (2d Cir. 2013)).  Here, First Unum's determination was not

unreasonable, erroneous as a matter of law, or unsupported by substantial evidence.

In reaching its determination, First Unum obtained an independent medical examination

and had the medical information provided by plaintiff reviewed by five different medical

professionals.  It communicated numerous times with Dr. Haber who repeatedly stated that

---

[7]  Although plaintiff also asserts that Dr. Haber was confused by First Unum's varying definitions of the
descriptor "sedentary," (Pl.'s Mem. at 18-19), the record reveals that Dr. Haber repeatedly confirmed that plaintiff
was capable of full-time sedentary work, and that she had the capacity to walk up to 1/3 of an eight-hour day.  (See
AR420; AR470; AR1200-01.)  Thus, Dr. Haber confirmed that plaintiff was capable of sedentary work as defined by
the DOT, i.e., a frequent level of sitting and an occasional level (up to one-third of an eight-hour day) of standing
and/or walking. (See 20 C.F.R. § 404.1567(a); AR1532; Exh. 8 to Friedman Dec. at 7.)  Furthermore, First Unum
notes that "[e]ven when Dr. Haber attempted to backtrack from [his concessions that plaintiff was capable of
full-time sedentary work], the most he would say was that Schussheim 'cannot stay on her feet for any extended
period of time' (AR1438-39), without further quantifying how long an 'extended period' was," and that "First Unum's
medical reviewers consistently concluded that Schussheim could stand and walk at least one-third of the day
(AR539, 1317, 1356-60, 1529-30."  (Def.'s Mem. in Opp'n at 14-15.)  Despite the fact that plaintiff points to
evidence that Dr. Haber stated that when plaintiff "uses her foot up to one-third of an eight hour day she cannot do
the same the next day," (AR1721), as discussed, First Unum was not required to defer to Dr. Haber's opinions,
especially where, as here, his opinions were inconsistent and contradictory and. in some instances, based solely on
plaintiff's subjective complaints and not a physical examination.

plaintiff could perform the duties of a sedentary occupation. Three different vocational specialists reviewed plaintiff's file. All these professionals concurred that plaintiff's foot problems did not prevent her from performing the duties of a medical malpractice attorney as of the time her benefits were terminated.

Plaintiff argues that there is a conflict of interest in this case because First Unum's plan administrator "both evaluates and pays benefit claims." (Pl.'s Mem. at 22.) Furthermore, plaintiff argues that "[t]he importance of [this conflict] is enhanced where an insurance company has a history of biased claims administration[, . . .] [s]uch [as in] the case at bar." (*Id.* (citation omitted).) First Unum, on the other hand, disputes that it has a history of biased claims administration, argues that its claims procedures have changed so as to ensure objective and fair results, and asserts that, in any event, any weight attributed to the conflict factor is not enough to tip the balance of the factors in plaintiff's favor. (Def.'s Mem. in Opp'n at 6-10.)

At noted above, plaintiff's claim was reviewed by five different medical professionals, three vocational specialists and an independent medical examiner. Additionally, plaintiff's treating physician's input was included in her file. *Cf. St. Onge v. Unum Life Ins. Co of America*, 559 Fed. Appx. 28 (2d Cir. 2014) (summary order) (rejecting claim that conflict affected disability decision where defendant employed numerous independent physicians and vocational evaluators and consulted with plaintiff and her treating physician). Further, the record contains evidence that First Unum's appeal process is conducted "by a person different from the person who made the initial determination," and "[t]he health care professional who is consulted on appeal [is] not . . . the individual who was consulted during the initial determination or a subordinate." (AR427.) Additionally, "[n]o deference [is] afforded to the initial determination"

on appeal. (Id.) Thus, the conflict of interest in this case is "less important" as a result of the "active steps [taken] to reduce potential bias and to promote accuracy." *See Glenn*, 554 U.S. at 117.

The Court agrees with First Unum that the presence of any conflict in this case is insufficient to tip the balance of the factors in plaintiff's favor. *See VanWright v. First Unum Life Ins. Co.*, 740 F. Supp. 2d 397, 405 (S.D.N.Y. 2010) ("The presence of a conflict of interest should be dispositive only as a 'tiebreaker,' and is not relevant when the conflicted party's conduct cannot otherwise be characterized as arbitrary or capricious."). As discussed above, First Unum's conduct was not otherwise arbitrary and capricious, and, therefore, any conflict of interest in this case is not dispositive.

In sum, the Court finds unpersuasive plaintiff's arguments that defendant's termination of benefits was arbitrary and capricious. To the contrary, there is substantial evidence to support the decision to terminate benefits.

Having determined that First Unum's termination of benefits was not arbitrary and capricious, the Court now turns to the issue of First Unum's Refusal to re-open the claim and consider the Social Security Administration's award of disability benefits.

## V. The Refusal to Re-Open the Claim and Consider the Social Security Administration Award of Disability Benefits was not Arbitrary and Capricious

On December 2, 2009, after First Unum completed its review of plaintiff's appeal and upheld its prior determinations denying plaintiff benefits and after the commencement of this action, plaintiff applied for Social Security disability benefits. Her application was approved on November 4, 2010. On November 19, 2010, plaintiff forwarded to First Unum the Social

Security Administration ("SSA") decision with a request to reopen her claim; however, plaintiff's request was rejected by First Unum on December 1, 2010.[8]

According to plaintiff, First Unum's refusal to consider the SSA award was arbitrary and capricious because it was in violation of the procedural requirements contained in First Unum's Benefits Center Claims Manual ("Claims Manual"). (Pl.'s Mem. at 4.)[9] Specifically, plaintiff relies on the section entitled, "Re-opening a Claim," which states: "When additional information or a new claim form is received on a closed claim, we must determine if the previous claim should be reopened or if a new claim should be marked-up." (Pl.'s Mem. at 4 (quoting Exh. 9 to Friedman Decl.) at 1 (internal quotation marks omitted).) Consequently, plaintiff asserts that First Unum was not permitted to simply reject her request.

First Unum argues, to the contrary, that (i) the relevant plan document that governed First Unum's decision was the Policy, not the Claims Manual; (ii) even if the Claims Manual governed First Unum's reopening decision, the Claims Manual explicitly states that it is subordinate to the Policy; and (iii) even if the Claims Manual were the governing plan document, it did not require the reopening of plaintiff's claim. (Def.'s Mem. at 22.)

In support of its argument that the Policy, rather than the Claims Manual, was the governing plan document in this case, and that the Policy did not permit more than one

---

[8] Plaintiff sought and received the Court's approval to amend her Complaint to allege that First Unum's Claims Manual requires it to consider the SSA award, and to claim that she is entitled to expand the administrative record to "include all documents relating to defendant's refusal to consider the SSA determination submitted by plaintiff after the denial of plaintiff's claim and appeal." (Am. Compl. 20-32.) Therefore, while the Court did not consider the SSA award in the context of First Unum's decisions regarding the denial of her benefits, the SSA award is relevant in the context of plaintiff's claim that First Unum's subsequent refusal to reopen her claim was arbitrary and capricious.

[9] By stipulation of the parties, the Benefits Center Claims Manual is part of the Administrative Record.

administrative appeal, cites the following portion of the Policy: :

> What do you do to appeal?
> You, the claimant, or your authorized representative may appeal a denied claim within 90 days after you receive the insurance company's notice of denial. You have the right to:
> 1.     Submit a request for review, in writing, to the insurance company;
> 2.     Review pertinent documents; and
> 3.     Submit issues and comments in writing to the insurance company.
> The insurance company will make a full and fair review of the claim and may require additional documents as it deems necessary or desirable in making such a review. A final decision on the review shall be made not later than 90 days following receipt of the written request for review. If special circumstances require an extension of time for processing, you will be notified of the reasons for the extension, and a decision shall be made not later than 120 days following receipt of the request for review. The final decision on review shall be furnished in writing and shall include the reasons for the decision with reference, again, to those policy provisions upon which the final decision is based.

(AR119.) This Policy language cited by First Unum, however, does not explicitly foreclose more than one administrative appeal. Moreover, the Claims Manual section entitled, "Information Received After Completion of an Appeal," indicates that more than one appellate review is possible. Finally, the Court finds defendant's argument puzzling in view of the fact that it did review the denial of benefits a second time. Therefore, the Court will proceed to review the "Re-Opening a Claim" provision relied on by plaintiff.

First Unum argues that this section is inapplicable, however, because it "applies primarily to situations in which the claim representative is assessing whether a submission is a new claim or recurrent claim," and "[t]here is nothing in this section addressing the submission of new information after appellate review of an adverse benefit determination, or while litigation is ongoing." (Decl. of Laura Kilmartin, dated Jan. 28, 2013 ("Kilmartin Decl.") at  12, 15.) Plaintiff responds that the "Re-opening a Claim" section expressly applies to situations where

additional information is received on a closed claim, and that, at the very least, "additional information on a closed claim must be sent to the Disability Benefit Specialist (DBS)" who must then decide whether to reopen the claim or mark it up as a new claim.  (Pl.'s Mem. in Opp'n at 15.)

First Unum, on the other hand, points to other sections of the Claims Manual which it argues were more germane to the circumstances of this case.  For example, First Unum cites the section entitled, "Late Appeals on Adverse Decisions," which provides in relevant part that, "[i]f additional information is submitted after the appeal period (i.e., it is submitted late), without an appeal, it should be treated as a late appeal and submitted to the Appeals unit for response." (Claims Manual annexed to Kilmartin Dec. at 10-11.)  The section continues that "[n]o additional review of the claim should occur."  (Id.)  However, plaintiff argues that this section is inapplicable because, here, "[t]he request to reopen and reconsider does not meet the definition of an 'Appeal' which is defined by the Manual as '. . . a written communication from claimant   . . . that disputes a final claim decision . . .' "  (Pl.'s Mem. in Opp'n at 16.)

First Unum also cites the section entitled, "Information Received After Completion of Appeal," which provides that, "[o]nce the appeal process has been completed, the administrative record is generally deemed 'closed,' " and "[t]he exception to this general rule happens when [First] Unum determines that an additional appellate review is in order."  (Kilmartin Dec.  8; Claims Manual annexed to Kilmartin Dec. at 3-4.)  Notably, this section further provides that "[w]hether or not the administrative record is closed depends on the circumstances under which the additional information is received," and that additional information includes "outside assessments of the claimant's condition."  (Claims Manual at 4-5, annexed to Kilmartin Dec.)

41

Finally, First Unum argues that the Claims Manual does not contain policies for it to follow when litigation is pending because all questions about a litigated claim are to be referred to its lawyers, not Benefits Center personnel. (Defendant's Brief at 16 citing Kilmartin Declar. ¶5 and Claims Manual 1.)

Plaintiff's reliance on the "Reopening a claim" section is misplaced. Under that section a claim may be reopened if it is a "recurrent claim" or if "the new/additional information is received on a claim that has been closed due to no response to a request for additional information;" neither of these conditions is present here. Plaintiff does not contend that her claim was a recurrent one, *viz.* a claim made after having received benefits and making an unsuccessful return to work. Nor did the last communication from defendant, i.e., its May 18, 2009 determination to uphold the prior appeal, request any additional information. In contrast to the November 20, 2008 determination upholding the denial of benefits which gave Schussheim thirty days to provide "whatever further information you may have," the May 18, 2009 determination advised plaintiff that First Unun had "completed a review of [her] appeal. No further review is available and your appeal is now closed." [10]

Moreover, as defendant points out, if the Re-Opening a Claim" is interpreted as plaintiff's suggests, it would always require First Unum to consider new information on every claim regardless of when or how it was submitted and would render superfluous the provision limiting

---

[10] Nor would plaintiff have been aided had a new claim been opened as under the policy, insurance terminates the date employment terminates and cessation of active employment will be deemed termination of employment except if the insured is disabled <u>and</u> benefits are being paid. Here benefits were no longer being paid. (AR 111.) There is nothing in the manual that would have required the defendant to open a new claim just to deny it in this case given that the claim was in litigation and that its manual contains guidelines, not hard and fast rules. The reopening a claim provision does not state that a claim must be opened, only that it should be, and the manual distinguishes between must, denoting "a policy or procedure that is to be followed without exception" and should, reflecting a guideline for handling claims. (Supp. Friedman Decl.. (DE 66) at Ex. 3.)

submission of new evidence after an administrative appeal.   It would also render superfluous the provision that "all files with ongoing litigation are referred immediately to Legal."

Given that the denial of benefits went through two levels of review and that the SSA award was submitted nearly one year after the second affirmance of the denial of benefits and the closing of the record, the need for finality supports the decision not to include it in the administrative record.

For all these reasons, the Court finds that First Unum's refusal to expand the Administrative Record to include the SSA Appeal so as to consider it was not arbitrary and capricious.[11]

## CONCLUSION

For the reasons stated above, plaintiff's motion for summary judgment is denied and defendant's motion for summary judgment is granted.   Accordingly, the Complaint is dismissed, and only defendant's counterclaim seeking to recover benefits under the Policy's pre-existing condition exclusion remains.   Defendant shall advise the Court by letter filed within 30 days of the date hereof how it plans to proceed on the counterclaim.

**SO ORDERED.**

Dated: Central Islip, New York
     January 14, 2015                     /s/ Denis R. Hurley
                                       Denis R. Hurley
                                       United States District Court Judge

---

[11] Given that the decision not to reopen the record to include the SSA Award was not arbitrary and capricious, the Court need not address the issue of the weight to be given to an SSA award.